# UNITED STATES COURT OF APPEALS

# FOR THE FOURTH CIRCUIT

RECEIVED
MAILROOM

MAR 1 2 2021

CLERK, U.S. DISTRICT COURT
ALEXANDRIA VIRGINIA

JOSE BENJAMIN MANLAPAZ              ]

MOVANT/DEFENDANT                   ]          Case No: 20-2128

                                   ]          1:17-cr-00115-001 (District)

V                                  }            Judge Anthony J. Trenga

                                   }

UNITED STATES OF AMERICA           }          **MOTION FOR REDRESS IN APPEAL**

RESPONDENT/PLAINTIFF               }          **PURSUANT TO 28 USC {} 1291**

                                   }          **DEDUCTIBLE BY MANIFEST**

                                   }          **INJUSTICE**


WHEREFORE, the movant, JOSE BENJAMIN MANLAPAZ, filing in propria persona, re-spectfully returns to this higher court maintaining he holds entitlement to redress on appeal, reasoning a priori, from this court's seemingly self-evident conclusions, via axiomatic error in decision.

Void argument, the movant has clearly been "procedurally ambushed" by the expli-cators of the law. This judicial forum has "blindsided" him in denial with a final judg-ment order, which in fact with deceitful purpose, he was disallowed rebuttal on merits for compassionate release, relevant to a life threatening Covid-19 pandemic, with the ambiguous laws interpreted by this over-reaching judicature.

With unexplained reasoning, this higher court, where justice is overly-publicized to exist, denied an extraordinary writ of error because, in its opinionated estimation,

this writ cannot be officially examined, because "there is another available remedy" and "this writ is not otherwise covered by statute." While this may appear very legal in principle, it lacks any substance because this court gives the petitioner no latitude.

What other alternatives? We are dealing herewith with legal error if not judicial misconduct by a district judge, nothing more.

It took this court of law over four months to make this basic, marginal ruling, which it should have concluded upon receipt of the writ, had it been focused on justice, due process and all those overlooked incidentals courts so readily disengage.

Further, almost in disbelief, this higher court attempts to justify its determination with three stated specific prior cases, all of which have absolutely no bearing on this matter for judgment. Let what follows enlighten this court of law.

Respectfully, the movant cites those cases as "Carlisle, Swaby and Torres". None hold remote similarity to the instant action. This court was legally obligated to offer the movant opportunity for refiling, to recharacterize the filing, with some semblance of understanding that this was a pro se submission, demanding latitude never received.

Let us be clear, this court accuses the movant of "mislabeling" his request for relief in a life threatening circumstance. However, what this court fails to admit is the remedy cannot be denied if the petition is otherwise meritorious. Show him it isn't.

This court never took the time to "turn the page" to even notice the merits herein, again probably blindly attempting to protect the district judge who committed four uncontestable errors in denying compassionate release attached to the Covid-19 pandemic. This was in direct violation of section 7.4, Appeals and Writs in Criminal Cases, Third Edition.

In simple clarification, this writ containing four errors, was filed because we are dealing with district court error that denied the movant justified relief.

Manlapaz would be remiss if not placing the three cases employed by this court to justify similarity in denial, under a microscope. First, none of them deals with compassionate release. More explicitly, "Carlisle" argued for acquittal under the All Writs Act, 28 USC {} 1651, through a writ of coram nobis. Contraire, the writ herein applies as a residual source of authority, because we are dealing with four actual errors by a district judge, which this court is visibly protecting under ambiguous law. The "Carlisle" case is totally irrelevant to the permissive rules of the case at bar.

Next, the "Swaby" case if even less applicable. It is an immigration breach of law, with a Section 2255 certainly existing as a viable option, negating any writ consideration. However, it does not remotely coincide with the instant action by way of a writ of coram nobis. And while this case was all about deportation, the court afforded it the opportunity for recharacterization, a requirement it simply avoided for this movant.

Lastly, the "Torres" case, referred to by this court in support, has some relevant comparison, but actually even more so contradicts this court's marginal determination in denial for the movant herein. In "Torres", this court again affords opportunity for recharacteriztion of his filing, a requirement it somehow misplaced for this movant.

This court will be detained no longer in attempts to have it justify all its ill-advised determinations in this case, whereby it has done nothing tangible to legally justify its conclusions in denial which remain highly suspect.

This court claims the movant mislabeled his filing, so be it. That doesn't mean the merits he presents are not beyond any reasonable doubt of justification. If so, then let this court review those merits and be challenged to legally absolve the four errors too obviously committed by a district judge.

To reiterate, we are herein dealing with compassionate release, a life and death threatening condition, and all the movant seeks is proper remedy based on irrefutable facts, nothing more.

With full due deference to this tribunal, Judge Trenga is a biased and prejudicial "purported" minister of justice, whose ruling in this case, based on the facts in presentment" has been short of lamentable.

With apology to the court if necessary, the movant has clearly substantiated his position, rightfully as a matter of law, and respectfully to avoid these persistent procedural delays, he now insists the following Memorandum of Law heretofore be adjudicated on its merits, as a motion in redress under 28 USC 1291, being a petition or appeal against a final judgment order of a district court, which must suffice in satisfaction of this court's determination that the writ of error filed was inappropriate, and this now makes its appearance as that elective alternative in remedy. This court is beseeched to proceed accordingly in full due process of law.


**MEMORANDUM OF LAW IN SUPPORT**

In the present case, four errors in exactness are cited to have negligently influenced denial of compassionate release in a potential matter of life and death, as it deals with the Covid-19 pandemic. These errors, from the face of the record appear as follows:

1. District Court Scrutinizes Wrong Medical Condition.
2. District Court Fails to Properly Ascertain the Intent of Congress in its Interpretation of "Extraordinary and Compelling Reasons".
3. District Court Unduly Minimizes the Rapidity of the Covid-19 pandemic.
4. District Court Labors Under Misapprehension in its Declaration that it Lacks Authority to Place Federal Prisoners in Home Confinement.


Regrettably, this denial for compassionate release must persist as a crude distortion of justice. With this rational logicalness, this appellate court must review these improprieties for "abuse of discretion", and exercise its authoritative powers to reverse this denial in judgment as authorized by 28 U.S.C. {} 1651(a).

2a

**In Forma Pauperis**

Additionally, the petitioner requests leave to proceed in forma pauperis, affirming under penalty of perjury that, because of his poverty, he cannot pay any filing or docket fees pursuant to 28 U.S.C. {} 1746 and 18 U.S.C 1621.

**Original Filing for Compassionate Release**

On May 26, 2020, Mr. Manlapaz filed a motion for compassionate release pursuant to 18 U.S.C. {} 3582(c)(1)(A), or in the alternative to be laterally transferred to home confinement to serve the balance of his remaining sentence, with both requisitions central to the Covid-19 pandemic. (His home detention eligibility date is July 29, 2024).

He cited his age (56) and medical conditions (diabetes and apnea sleeping disorder) as "extraordinary and compelling" reasons for this request. He regularly requires insulin and takes prescribed medication, including Lisinopril (high blood pressure) and Simvasatin. He argued that his exposure to the coronavirus at the prison facility in Morgantown FCI, where he currently resides, serving the remainder of his sentence, exposes him to particularized risk.

He pointed out he is no danger to the community and his release plan adheres to the mandates of Section 3553(a). He was lucid in denoting his medical condition in isolation exposed him dangerously to the symptoms of the coronavirus.

He further supported his argument with available statistics at the time, associated with the Covid-19 pandemic. By way of passage of the First Step Act, the District Court had jurisdiction to grant Mr. Manlapaz compassionate release without delay.

In his motion for remedy, he also conveyed to the district court that other reasons should be considered to supplement his primary medical issue in presentment to justify "extraordinary and compelling reasons."

Most significantly in his motion, Mr. Manlapaz indicated he had no way of knowing that the BOP was considering inmates for home confinement in conjunction with U.S. Attorney General Barr's April 3 2020 and March 26, 2020 directives. Apparently, the BOP, by way of these memorandums, has enacted a list of candidates for consideration to home confinement.

No one from the BOP has ever approached or made the petitioner aware or addressed his competence in such transfer, or referred to the specifics of his release plan.

This openly provides additional evidence that the BOP has not identified him for priority review, never forgetting his medical condition in isolation places him squarely for consideration.

Being at grave risk to contract the virus, the petitioner has less than four years remaining on his sentence, an unnecessary endangerment if he were to contract the virus and perish from the indicants.

**Court Order in Denial**

Regrettably, the district court erred in several matters of contention in its perceptible, prejudicial attempt to deny the entitled petitioner his requisition for compassionate release, or lateral transfer to home confinement to serve the balance of his disciplinary punishment. This would be in full accord with the established policy resulting from Attorney General Barr's March 26, 2020 memorandum, to place Covid-19 at-risk inmates at their places of residency outside prison.

This honorable court is now directed with detail to those irresponsible errors in judgment.

**Error Number One: District Court Scrutinizes Wrong Medical Condition**

The primary medical issue in presentment within the petitioner's motion for com-passionate release is Type 2 diabetes. Yet, in "plain error" the court devotes exten-sive dispute in denial detailing Type 1 diabetes.

It is certainly cognizable how the district court wrongfully determined the peti-tioner's "extraordinary and compelling reasons" for compassionate release, central to the Covid-19 pandemic, as devoid, since it inspected and assumed an inaccurate medical condition it errantly associated with him.

In the court's own vernacular, with emphasis added on the misplaced condition, it avers, "Based on the record, there are no extraordinary and compelling reasons for a sentence reduction based on the threat the defendant faces...on his overall health..." (ECF #219, at p.4)

Admittedly, the court is referencing its anomalous interpretation that Mr. Manlapaz is a Type 1 diabetic.

A priori, no one can be denied compassionate release, especially in the presence of a deadly global virus, when the "reviewer" of the instant action, in this case, Judge Anthony J. Trenga, errs in broaching the correct medical condition, central to the early release.

Void any possible argument, Judge Trenga committed "plain error" which fostered his "abuse of discretion." "Plain error" is so obvious and prejudicial that an appellate court must address it despite the parties' failure to raise a proper objection at trial." (Black's Dic. Deluxe 11th Ed., at 684).

In furtherance, a "plain error" is oftentimes said to be so obvious and substantial that failure to correct it would infringe a party's due-process rights and damage the integrity of the judicial process. {See Fed. R. Evid 103(d)}.

This "error" might be argued "harmless", if it persisted in confusion, but it clearly did not. In the petitioner's motion for sentence reduction via compassionate release, Argument IV annunciates, "Releasing Mr. Manlapaz is appropriate given his history of Type II diabetes and Sleep Apnea, and his rehabilitation while incarcerated."

Contraire, in its denial, the court order observes, "Defendant is currently 56 years old and is diagnosed with Type 1 diabetes." In toto, Judge Trenga committed a "fundamental error" apparent of record.

**Error Number Two: District Court Fails to Properly Ascertain the Intent of Congress in its Interpretation of "Extraordinary and Compelling Reasons"**

Let this honorable court be awakened to the fact Congress never defined what constitutes "extraordinary and compelling reasons." (See 28 U.S.C. {} 994(t)). Instead, Congress directed the Sentencing Commission to promulgate "the criteria to be applied" with a list of specific extraordinary and compelling examples.

Prior to the First Step Act, the Commission provided just three such examples: (1) terminal illness; (2) elderly inmate declining health; and (3) special care for dependent family members. (USSG {} 1B1.13 cmt n.1). The only statutory prerequisite added was that a defendant must not be a danger to the safety of any other person or to the community. (USSG {} 1B1.13(2).

In the midst of a global pandemic, who has the power to randomly decide what constitutes, "extraordinary and compelling reasons," as we deal with life and death decisions, aside from three unrelated pre-existing conditions established by the Commission?

Surely, not the Bureau of Prisons, who proved its discretionary worthlessness when compassionate release first became available through the Second Chance Act in 2008. That attempt by Congress to reduce over-populated prison habitancy, by

placing the BOP in charge, was a "common disaster," and this admittedly is neither the time nor place to expand on that "horror story" with factual data.

So, if one cannot with exactness identify "extraordinary and compelling reasons" during a pandemic, how can unrelated criteria suffice to be used by district court judges in denial of compassionate release for "extraordinary and compelling reasons?"

Moving forward, Congress and the Commission did manage to feature "two guide-posts". An "extraordinary and compelling reason" need not have been unforeseen at a sentencing hearing (id {} 1B1.13 cmt n.2), and while rehabilitation in itself cannot satisfy "extraordinary and compelling reasons", it can be considered at the time of resentencing, with other factors. (Section 994(t); also see 1B1.13 cmt n. 3).

With sound reasoning and the presence of Covid-19, isn't a better course of action in the assessment of "extraordinary and compelling reasons" for inmates, one of ascertaining if existing medical conditions fairly support the likelihood of contracting the deadly virus. Why should any other encouragement be needed?

A priori, if an inmate's medical condition is a consequential portent to contamination by way of the coronavirus, no other part of USSG application notes should be necessary for compassionate release to be granted.

In the case at bench, Type 2 diabetes is the prevailing medical condition, recognized by the CDC as one of the two highest risk conditions for severe consequence if a positive test was forthcoming.

Let us be clear, Section 3582(c)(1)(A) contemplates sentence reduction for specific individuals; it is not designed for the widespread prophylactic release of all inmates amidst this global viral pandemic. Consequently, no other reasons should be necessary.

Conjoin Judge Trenga's harmful and disarming abuse of discretion in his denial of Mr. Manlapaz's motion for compassionate release, with the simple fact the coronavirus is now actively worsening at Morgantown FCI, thereby, expediting the risk factor for the petitioner to contract the disease.

Judge Trenga was far too cavalier in using the fact Morgantown FCI, was at that moment in time, clear of infection, vividly naïve to scientific fact of how a virus survives. Deductible by this ill-advised determination of Judge Trenga, with this higher court now fully apprised of the situation, the petitioner implores this court of law to intervene and remand his compassionate release motion back to the district court for reversal.

The second visible error by the court is when it states with certitude, ". . .based on the record, there are no "extraordinary and compelling reasons" for a sentence reduction based on the threat the defendant faces. . ." (ECF # 219 at p.4). These "words of wisdom" come from a judge, completely insensible to the impact of the Covid-19 pandemic.

Judge Trenga was crystal with his "personal misguided opinion" of what constitutes "extraordinary and compelling reasons" as qualifiers for compassionate release, pursuant to 18 U.S.C. {} 3582(c)(1)(A), as amended by Section 603(b)(1) of the First Step Act. (Pub L. 115-391, 132 Stat. 5194).

The court order, in disaffirmation declares, "Defendant has not presented extraordinary and compelling reasons that warrant his release under 18 U.S.C. {} 3582 (c)(1)(A)."

This tribunal is now directed in specificity to the "reasons" introduced by the petitioner for that remedy, under the criteria of compassionate release, or to lateral transfer to home confinement to serve the balance of his sentence central to his high risk of contracting the coronavirus. His potential risk is scientifically evident, not substantiated by discretionary opinion of a naïve judge.

8

1. The initial motion acknowledges, "He is particularly susceptible to Covid-19 and is more likely to suffer dire consequences from the virus, due to the fact he is 56 years old, Non-Caucasian, and was diagnosed with Type 2 diabetes. . ." (ECF #211 at 1).

We need travel no further. Current statistical data in segregation support three statements of fact herein with adequate impact to satisfy the "extraordinary and compelling reasons" requirement.

Mr. Manlapaz is Non-Caucasian. Through May 30, 2020, according to the Centers for Dis-ease Control and Prevention (CDC), the Covid-19 pandemic resulted in 5,817,385 cases and 362,705 deaths, world-wide, which included 1,761,503 aggregated reported cases and 103,700 deaths in the United States (with deaths now exceeding 200,000). Thirty-Three (33) percent were Non-Caucasian.

Mr. Manlapaz is 56 years of age. Incidence is highest amongst persons aged 40-49 and 50-59. The median age is 48 years (interquartile range = 33-63). In addition, from amongst 101,133 reported hospitalizations with the virus, 31,588 patients were between the ages of 50-59.

Mr. Manlapaz is a Type 2 diabetic. Again, according to CDC statistical data, the two most underlying health conditions by CDC providing the highest risk for contracting Covid-19, are cardiovascular disease (32%) and Type 2 diabetes (30%).

In brief summation, Mr. Manlapaz is a 56 year old Asian/Pacific Islander (API), diagnosed with Type 2 diabetes, which historically leads to cardiovascular disease.

In the spirit of this understanding, and these statistical statements of fact, it is difficult to comprehend how Judge Trenga, duly noted he couched himself in "plain errors" of judgment, still could not recognize the "extraordinary and compelling reasons" brought to the forefront by the petitioner in his quest for deserving compassionate release or lateral transfer to home confinement.

Citing case law in further fortification, the petitioner directs this higher court to the "Ladson" decision, wherein the district court, validated by the government, did not contest 54-year-old, defendant, Malcolm Ladson's "extraordinary and compelling reasons" for compassionate release, being his age and his Type 2 diabetic condition.

According to that court, Mr. Ladson satisfied the requirement of Congress' intent of "extraordinary and compelling reasons". (United States v Ladson, 04-697-1 E.D. Pa, 2020).

In the accompanying order, his sentence was reduced to time served with modification to his supervised release conditions, to ensure his continued progress through a stable home environment, employment and community outreach.

The present case is closely aligned to Mr. Ladson's, and could justifiably be mirrored in resolution.

**A Closer Look at Type 2 Diabetes**

Type 2 diabetes is a chronic disease that affects the way the body regulates blood sugar, or glucose. Glucose is the fuel that feeds the body's cells, but to enter those cells it requires a "key", that being insulin.

People with Type 2 diabetes don't respond to insulin as well as they should. Type 2 diabetes can lead to chronically high blood sugar levels. This increases the risk of complications, not the least of which is the Covid-19 pandemic, especially for prisoners.

While the symptoms of both Type 1 and Type 2 diabetes are similar to a point, there are distinct variations. The court can refer to the petitioner's medical records (Exhibit A).

Mr. Manlapaz oftentimes experiences numbness and tingling in his hands and feet. As a Type 2 diabetic, he has insulin resistance. Because the petitioner's body is unable to effectively use insulin, glucose accumulates in his bloodstream.

The Non-Caucasian populations have higher rates of diabetes. Without controlling this disease, serious complications can develop. This is evidenced in the petitioner's medical reports. High glucose levels have damaged his nerves and blood, which can lead to heart disease, stroke, blindness, kidney disease and gum infections. Advanced Type 3 diabetes can result in blindness and the need to amputate limbs that no longer get adequate circulation.

This vulnerability only compounds the potential disaster that could result if Mr. Manlapaz contracts the coronavirus, as it has now arrived at the Morgantown FCI federal prison facility in full force. (See Error Three on page 14 herein).

The CDC recognizes diabetes as a primary higher risk of severe illness from Covid-19. A recent meta-analysis of nine studies from China showed a significant correlation between diabetes and the severity of the coronavirus symptoms. Further, a recent United States study found a fourfold increase in mortality rates from Covid-19 amongst diabetic patients.

How exactly diabetes impacts Covid-19 severity is unclear, but there are a number of potential factors. Poor blood sugar impairs immune response to secondary bacterial infections of the lungs, common among Covid-19 patients. In addition, pre-existing conditions associated with diabetes, like hypertension can lead to worse outcomes from Covid-19.

Given the medical data, judges recognize the unique risk presented by the combination of Covid-19 with diabetes. For instance, in "United States v Rivernider," Judge Robert N. Chatig  found "extraordinary and compelling reasons" where the movant seeking compassionate release was 54 years of age with diabetes, and heart-related disease, all significant risk factors for severe illness, if he were to contract the coronavirus.

The government acknowledges that if an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming

seriously ill from Covid-19, that condition may satisfy the standard "extraordinary and compelling reasons" (United States v Reece, Case 16-2088-JAR, D. Kan, July 13, 2020).

This appeal in presentment should therefore be granted due to the "extraordinary and compelling reasons" attributable to Mr. Manlapaz. Led by Type 2 diabetes, he suffers from sleep apnea, has issues with his kidneys and prostate gland, as well as sporadic occurrences with deterioration of his eyesight.

Given these factors, the element of risk associated with the coronavirus would surely impact his health in a downward spiral.

**Additional Medical-Related "Extraordinary and Compelling Reasons"**

From a cultivated medical viewpoint, in addition to being a Type 2 diabetic, the petitioner gives formal warning to the additional medical conditions that impact his risk to undertake Covid-19. These include:

- Petitioner suffers from severe sleep apnea, requiring the daily use of a CPAP machine while sleeping. During sleep, tests have disclosed his throat "closes" 150 times per minute which in fait accompli requires surgery to "shave the lining of the throat to open the breathing passage." This is a highly delicate operation which could result in the loss of speech. The BOP simply disregards spending "budgeted" money for such a condition, which amplifies the symptoms of the coronavirus, as it hampers the respiratory process. With the petitioner's condition in this regard, this could be fatal if contracted.

- It has already been established that Type 2 diabetes could lead to blindness. On two occasions, as evident in the medical records (Exhibit A), the petitioner has begun to experience serious eye-related issues (March 12, 2019), whereby his vision was weakening and dark spots began appearing from his left eye which were hampering his sight. That condition persists. The second occurrence required medical attention on June 11, 2019. Although stabilized for the

time being, if he contracted the coronavirus, this condition could rapidly escalate.

- His diabetes has led to a kidney condition, whereby he takes 1000mg of metformin twice daily and glipizide twice daily as a protective measure.
- His diabetes has recently brought to the surface a prostate condition, necessitating the intake of the medication, tamsulosin (generic for flowmax).
- The petitioner consumes the following medications on a daily basis: Lisinopril (high blood pressure) and Simvastatin; insulin long acting 14 units + 2 short acting units in the morning; 11 units + 2 short acting units in the evening; atorvastatin for high cholesterol (heart related); and aspirin for blood thinner.

**Rehabilitation Conjoined by Section 3553(a) Factors and a Bonafide Release Plan Weigh Heavily for Remedy**

Mr. Manlapaz is certainly not a danger to the community, and his prison record discloses he has been rehabilitated. Further respect for the law, general deterrence and other notable Section 3553(a) factors would not be undermined by converting the remainder of his sentence to home confinement, given the cataclysmic events of the current pandemic. He is a criminal history category I, first-time offender.

The petitioner has strong support in the community. He has maintained close ties with his family, and upon his release he will be living with his wife, a physician, (who has pledged to support petitioner until he can secure employment), and their young son, Joseph, at their family home in McLean, Virginia. There is admittedly no reason to believe he would ever present a danger to society.

Since incarcerated, since May 31, 2017, he has actively participated in BOP sanctioned programs, and has diligently maintained prison employment. Additionally, he mentors younger inmates and has completed rehabilitation programs offered by both Alexandria ADC and Morgantown FCI.

Not to be diminished, Mr. Manlapaz is a 10-year veteran of the United States Air Force, having been honorably discharged therefrom.

**Error Number Three:   District Court Unduly Minimizes the Rapidity of the Covid-19 Pandemic**

Covid-19 is a respiratory disease spreading through respiratory droplets produced when an infectious person talks, coughs or sneezes. Spread is more likely when people are in close contact with one another.

On April 20, 2020 the number of inmates in BOP custody, that were infected with the virus, had more than doubled and inmates deaths had increased by 25%. There were 495 infected inmates, 309 infected staff and 22 inmate deaths. Seven days later, April 27, 2020, there were 1,046 infected inmates, 330 infected staff and 28 inmate deaths (bop.gov/coronavirus/)

According to public health experts, incarcerated individuals are at special risk of infection, given their living situations, and they may also be less able to participate in proactive measures to keep themselves safe, like the petitioner who must rely on staff for his diabetic condition.

As of June 16, 2020, the five largest known clusters of Covid-19 in this country grew inside correctional institutions. During the past month, a number of known infected incarcerated people doubled, and prison deaths increased by 73%.

One of Judge Trenga's reasons in denial was that there were no reported positive coronavirus cases at Morgantown FCI. Somehow, the good judge forgot to mention that possibly that was because Morgantown FCI did "no testing". Further, District Court judge, R. Pratt, stated in "United States v Nicholson, No. 09-cr-00058-RP-CFB, S.D. Iowa, June 6, 2020," "As other courts have noted, the fact that a prison has no confirmed open cases today does not provide much assurance in the current environment."

That has changed. Morgantown FCI now has four positive tests for Covid-19, with five tests pending results (oops, two more have just tested positive while in quarantine). This is a direct result from 90 recent tests finally administered from the facility's general population of 482.

Things have changed since Judge Trenga's ill-advised denial in judgment herewith, and they are sure to worsen, as history in the federal prison system affirms. To start, let it be noted Morgantown FCI is physically located in the state of West Virginia, where presently 13,196 Covid-19 cases have been diagnosed resulting in 290 deaths.

Extract from those numbers 1,768 cases and five deaths, which occurred in Monongalia County, where Morgantown FCI sits, recognizing the majority of prison staff members reside in that county. It doesn't take a "rocket scientist" to rationalize what is happening and will happen at the Morgantown FCI federal prison facility. The virus persists in multiplication.

One only need compare Morgantown FCI to other prisons. For the benefit of this honorable court, the highest number of Covid-19 positive tests of inmates in the federal system is 1,322 at Segoville FCI with 1,658 completed tests; the Fort Worth FMC has 589 positive tests with 935 having been administered. The Forest City low FCI has 664 positive tests, while Terminal Island FCI has 608 positive tests. They all started with none.

Need the petitioner proceed? It is not a matter of speculation whether the Covid-19 pandemic is for real. It actively persists as a serious virus penetrating the federal prison system. Inmates are dying, many of which were never given "death sentences", not the least of which was Manlapaz.

Regrettably, Mr. Manlapaz's denial for compassionate release could not have been determined with an objective state of mind. Therefore, with this rational logical void, this appellate court must review these improprieties for "abuse of discretion," and exercise its own authoritative discretionary powers, deductible only by the factual

data in presentment herein, to substantiate relief for the petitioner, pursuant to 28 U.S.C. {} 1651(a).

Morgantown FCI has gone from "zero" to six positive tests, with the numbers now rising like the tide.

In this regard, the CDC has strongly advised individuals to avoid crowds, stay at home as much as possible, practice heightened levels of hygiene and social distancing, limiting close contact with others as much as possible.

This court certainly need not be reminded that people in BOP custody are unable to take any such proactive measures to protect themselves. Factually, prison conditions are in direct contrast with best practices for limiting contagion and promoting public health during a pandemic.

In specificity, Morgantown FCI utilizes close quarter housing and is unable to adequately distance prisoners, all but guaranteeing a more rapid spread of the virus, now that it has found its way into that prison facility.

The medical facility at Morgantown FCI is not staffed or equipped to deal with increased numbers of seriously ill people who will need critical care that could last for weeks, as serious cases of Covid-19 surface.

The petitioner beseeches this higher court to recognize the serious potential risk he faces with this virus now at the doorstep of the Morgantown FCI prison facility. Either grant his compassionate release instantly, or compel the BOP to transfer him to home confinement to serve the balance of his sentence via lateral transfer under section 3624. (less than four years).

Scientifically, let us be clear, the current six positive tests at Morgantown are bound to multiply, since that is how a virus of this magnitude effectuates.

In a recent memorandum issued by Andre Matevousian, Acting Assistant Director of the Correctional Programs Division for the U.S. Dept. of Justice, "the matter of home

16

confinement has now been aggressively intensified due to the increasing impact of Covid-19 in prisons in general."

This memorandum has compelled the BOP to deploy its limited resources in the most effective manner, that being to release suitable inmates for home confinement, if not compassionate release as quickly as possible.

Why should it be necessary to wait until Morgantown FCI becomes a Segoville or even a closer located facility like Elkton FCI, in Ohio, where there are currently 951 positive tests of the coronavirus, at last count?

Once again, in brief summation, Judge Trenga abused his discretion in denying the fully qualified petitioner compassionate release, or in the alternative, instant discharge to home confinement on lateral transfer to serve the balance of his sentence.

For the record, on July 22, 2020, Morgantown inmate, JaJuan Omar Gardner was granted compassionate release by the Honorable Terrence G. Berg, Eastern District of Michigan, under the "extraordinary and compelling reasons" that his medical condition (heart disease), as rated by CDC, was severe enough to place him in a much more vulnerable position than a healthy person if he contracted the coronavirus, and he was declared no danger to the community, even though he was a career offender. (United States v Gardner, 14-cr-20735, ED Mich, July 22, 2020). Emphasis added, "a career offender". This petitioner is a "one-time" offender.

### Error Number Four: District Court Labors Under Misapprehension in its Declaration that it Lacks Authority to Place Federal Prisoners in Home Confinement.

In the petitioner's motion for compassionate release he distinctly articulated two freedoms of choice for the court, since at issue is a timely and deadly global virus flatly discounted by the Trump Administration.

Both choices for the court are consistent with Sections 3582, 3624 of Title 18, and the First Step and CARES Acts. These identified authoritative laws gave the district

court the governance to release the petitioner to home confinement pursuant to Section 3624.

Let us be clear, because a denial for compassionate release affects a prisoner's rights, especially during a global pandemic, these denials by district courts can be challenged routinely as "errors in final judgment" in full accord with 28 U.S.C. {} 1291.

A fortiori, this higher court holds the authority and jurisdiction described in statutes 28 U.S.C. 1292(c) and 28 U.S.C. 1295, to unerringly overturn a compassionate release denial.

Because of this endurance, the statement made by Judge Anthony J. Trenga in his "boilerplate" denial of the petitioner's deserving attempt at compassionate release, must be branded "plain error".

To reiterate that prejudicial conclusion, his opinionated message is re-echoed, "This court does not have the authority or jurisdiction to review the defendant's eligibility for home confinement..." (Supra at 5).

This court can alternately order the petitioner's release to home confinement under 18 U.S.C. 3624 (c)(2) as amended by Section 12003(b)(2) of the CARES Act.

With less than four years remaining on his sentence, this optional relief can still protect him from added risk of the coronavirus.

Allowing the district court all benefit of doubt, in error to be sure, this higher judicial assembly occupies the authoritative power and jurisdiction to grant the petitioner release to home confinement in one of the two freedom of choices offered herein, deductible by a life-threatening virus that has now made its way into the Morgan-town FCI prison facility.

This court of appeals retains three approaches it can employ to decide this instant action in demanded review. It can uphold the lower court's decision, carefully con-

sidering all the "plain errors" Judge Trenga has admittedly chosen. Or, it can simply reverse the decision and grant the request with either option, or remand the case back to the district court with categorical imperative.

With statements of fact, policy and law, Mr. Manlapaz implores this higher court to overturn the district court's error-filled determinations in denial and allocate remedy.

These four (4) errors insist, beyond any reasonable doubt, Judge Trenga is incognizant to the significance of the Covid-19 pandemic. He vividly abused his authoritative discretion, mandating his irresponsible decisions must be overturned with immediacy.

Clearly, this Article III judge is handling this virus as some unobtrusive discretionary legal issue, based on his subjective opinion, as to who should and should not be released from prison with the singular risk being life or death. Mr. Manlapaz was not sentenced to death.

With purpose, it remains the petitioner's firm concurrence that the role of an appelate court is to review the decisions of lower courts to ensure that those bodies function lawfully and that litigants receive justice under law.

This appellate court, at this level, is the catalytic converter for the entire judicial system. (Daniel J. Meader; Jordana Simone Berstein, "Appellate Courts in the United States" – 1994).

This lawcourt bears the responsibility with jurisdiction in this matter pursuant to 28 U.S.C. {} 1291, as there has been a final adjudication by a United States District Court on June 23, 2020.

While compassionate release may be labeled "another type of appeal", notwithstanding, because it can be challenged, it thereby qualifies for "overturning a lower court's decision."  Mr. Manlapaz hereby insists, as matter of law, this tribunal address this appeal to the fullest.

If this court prefers, call it a "judicial review of a case involving a certain federal agency (BOP) or a program (i.e., BOP Program Statement 5050.49). In either direction, it must be reviewed for reversal for "extraordinary and compelling reasons" totally ignored and/or misconstrued by Judge Trenga, whose errors in this case at bar are all too identifiable.

In recall, the Honorable Judge Trenga, made the erroneous statement, "The court did not have the authority or jurisdiction to review decisions for home confinement under the CARES Act..." (Supra at 5).

Emphatically, Judge Trenga, has been overwhelmed with these varying stories for compassionate release, and he regrettably lacks an appreciation for the impact the coronavirus has on the federal prison system. This is obvious, when part of his denial to the petitioner included, ". . .there are no current Covid-19 cases at Morgantown FCI".

Factually, in contradiction, that number will be climbing, an inevitable occurrence controlled only by time.

Should this "place where justice is administered" require additional substantiality, it is directed to the California Supreme Court decision in "People v Loper 60 Cal 4th 1155, 343 P. 3d 895 – Cal – 2015".

Here, the court held that prisoners who are denied early release under the compassionate release statute have a right to appeal, reversing an appellate court decision that found prisoners had no such right. (March 15, 2015).

Voiced this highest court in California, "prisoners rights are affected when denied compassionate release, and they are entitled to appeal to reversal of those decisions. Reversals that must come from appellate courts.

This higher court is again reminded, though it shouldn't be necessary, we are in the midst of a global pandemic, with prisons perfectly postured to expeditiously bring

death to many of its residents. Mr. Manlapaz was not sentenced to death when he breached coherent IRS laws.

## Criminal Case Background

On October 19, 2018, the court sentenced Defendant Manlapaz to 108 months in the custody of the Bureau of Prisons (BOP) for his violation of 18 U.S.C. {} 371, conspiracy to defraud the United States; for his violation of 26 U.S. C. {} 7206(2), assisting in the preparation of false tax returns; for his violation of 18 U.S.C. {} 1341, mail fraud; and for his violation of 18 U.S.C {} 1343, wire fraud.

He began serving his sentence on November 20, 2018, holding a projected release date of January 29, 2025, and a home detention eligibility date of July 29, 2024, less than four years hence. As of August 29, 2020, he has completed 39 months of his award in punishment.

Having experienced trial, Mr. Manlapaz insists he was not only wrongly convicted, but he was unreasonably sentenced, even though the disciplinary punishment invoked upon him was under his guideline range. The punishment imposed on the petitioner (108 months) elevates the concern for sentence disparity according to "socio-economic" status particularly because the "mean length of imprisonment for fraud offenders is 39 months (United States v Sample, 901 F.3d 1196, 1200 – 10th Cir – 2018).

Since imprisoned, Mr. Manlapaz has persisted in appeal presenting strong arguments, indicating his case persists with ongoing challenges. To illustrate, in these consolidated appeals, the petitioner asserts several counts in an unexpected superseding indictment lacked timeliness, a motion to suppress was flatly denied, there was insufficient evidence to indict him, substitute assets were used to satisfy an inaccurate forfeiture amount, and his restitution amount was over-calculated within the confines of his alleged criminality.

The petitioner is not before this court of law, to further appeal the essential parts of his criminal case. He cites his case, only to emphasize the actualization that he is a first time, non-violent offender, who still maintains his innocence in part, with no possible chance for recidivism of any kind. His alleged "breach of law" is central to "white collar crime".

## Supplemental Data To Reaffirm Justification for Compassionate Release

In 2018, when Congress passed the First Step Act (Pub.L. 115-391, 132. Stat 5194), there was no policy statement applicable to motions for compassionate release filed by defendants under the First step Act.

By its terms, the old policy statement applied to motions filed by defendants for compassionate release.

The sentencing commission has not found time to amend or update this old policy statement since the First Step Act was enacted (United States v Gross, No. 2:04-cr-32-RMP, 2019, ED Wash, June 11, 2019), nor has it adapted a new policy statement applicable to motions filed by defendants.

While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether "extraordinary and compelling reasons" warrant a sentence reduction under Section 3582(c)(1)(A)(i). Not only is the interpretation of the old policy statement inconsistent with the Commission's statutory role, it is also inconsistent with the First Step Act., which was  enacted to further increase the use of compassionate release.

Any interpretation of the old policy statement as binding on new compassionate release procedure is likely to be interpreted as inconsistent with the Commission's statutory role. (United States v Cantu, No. 1:05-cr-458-1, 2019, ED Tex, June 17, 2019).

**Sentencing Commission Policy Subdivision D**

Here, the petitioner is introducing "other reasons" in combination with his serious medical condition, to warrant compassionate release or lateral transfer to home confinement.

Of the cases typically cited in relevance to compassionate release, several are irrelevant because they address the issue based on subdivisions "A" through "C" of the Sentencing Commission's policy, for medical condition, age or caregiver status. Seldom, if ever, is the catchall provision "D" brought to the forefront. (See United States v Willis, 382 F. Supp. 3d 1185, D.N.M. 2019).

Other reasons include, ". . .if there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions "A" through "C". . ."

As expressed elsewhere herein, the petitioner is a 56-year-old, one-time offender who breached the tax laws. There is no violence in this case, there is no possible chance for recidivism. This case went to trial because innocence to a point was prevailing, and there exists strong disparate argument that the 108 months he received, was unreasonable as evidenced in an independent disparity comparison report including defendants with similar records who were found guilty of similar crimes. The 8-page report was submitted to the petitioner's sentencing court in a Sentencing Memorandum prior to his criminal sentencing hearing on October 19, 2018.

Mr. Manlapaz has diligently appealed his case since incarceration. And while he is now herein making no attempt in continuance of his case appeal, he considers his case issues worthy of consideration as Section "D" qualifiers for "other reasons" to support his medical condition herein in his requisition for approval of compassionate release, or lateral transfer to home confinement pursuant to the CARES Act.

23

In addition to his unreasonable sentence, consideration should be given to these additional issues, only from the standpoint, he was ruled against via ambiguous law, as this court must surely recognize, no statutes are more open to various interpretations than tax laws. Had the petitioner been favored in any one of these issues, his sentence would have been far removed what what was invoked.

These included: contesting several legal and factual sentencing guideline calculations; several factual objections in his PSR; to this day he adamantly objects to the calculated loss amount attributable to him; he was enhanced four levels for being an organizer, even though the government never proved there were a requisite number of participants to so qualify him; he was enhanced 2-levels for obstructing justice, when in fact  the accusation involved a misunderstood question; the government pursued a 2-level enhancement for sophisticated means, when in fact law requires more than concealment or complexities are inherent to tax fraud.

Again, the sole purpose in presentment of these "case-related" issues is to illustrate they were all argumentative, and with more advanced litigation could easily, in part, have been removed, substantially lowering the petitioner's award in punishment.

**Cumulative Error**

While the petitioner holds entitlement to this appeal, should this judicial assembly rule these errors are categorically "harmless", it cannot disregard the Cumulative Error Doctrine.

While this court of law may rule these errors, viewed singularly, are not reversible, when viewed cumulatively, the net effect results in the determination the petitioner was wrongfully denied compassionate release, and he remains at high risk to contract the virus, especially more so now, as it literally has become visible at Morgantown FCI (United States v Riddle, 103 F,.3d, 423 – 5th Cir – 1997).

The prevailing miscues committed by Judge Trenga in his fortuitous adjudication of compassionate release, or lateral transfer to home confinement under the CARES

Act, for the petitioner, had the cumulative effect of prejudicing the outcome. A fortiori, this authoritative opinion must amount to "plain and reversible error". Did this district judge employ his discretional authority so poorly it deprived Mr. Manlapaz of relief as it pertains to life preservation?

## Conclusion

It is not a matter if the 56-year-old petitioner qualifies for compassionate release or transfer to home confinement under Section 3624, under the pressing nature of a global pandemic penetrable in the federal prison system. His denial persists in disbelief.

No court can possibly argue in defense of the "plain errors" committed by Judge Trenga in this case at bar. The petitioner will stop short of accusing the Bureau of Prisons of being prejudicial in its selection process for home confinement in either direction, via compassionate release or by way of the Cares Act under 18 U.S.C. {} 3624(c). Combine the two, however, and the end result is a perceptible miscarriage of justice.

To avoid the added embarrassment of sinking deeper into the misfortune of what has transpired in this unblended review of compassionate release in this case, central to a life threatening Covid-19 pandemic, the petitioner prays this higher court will accept its responsibility and face this problematic task of correcting these crucial errors of a judge totally naïve of his surroundings.

This straightforward request by Mr. Manlapaz for deserving relief deductible by his medical condition in toto, with added "other reasons" in support, has regrettably given the judicial system yet another blackeye with his request becoming a fugitive from justice.

Discretion consists in knowing through the law what is just. This court cannot allow this injustice to prevail.

RESPECTFULLY, submitted on this___4th___day of__March__~~2020~~ 2021 JM by

_MR. JOSE BENJAMIN MANLAPAZ (#91156-083)_

Federal Correctional Institution

Morgantown FCI

P.O. Box 1000

Morgantown, WV 26507